# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1286V
UNPUBLISHED

| | |
|---|---|
| CASEY R. MORGAN,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: September 2, 2022<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Meningococcal Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*Amy A. Senerth*, Muller Brazil, LLP, Dresher, PA, for Petitioner.

*Zoe Wade*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On September 29, 2020, Casey R. Morgan filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered a shoulder injury related to vaccine administration ("SIRVA"), as defined in the Vaccine Table, after receiving a Meningococcal B vaccine on July 5, 2019. Petition at 1, ¶ 2. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). Although a ruling on entitlement in Petitioner's favor was issued in December 2021, the parties have been unable to resolve damages on their own.

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755.  Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount **$64,308.09**, **representing $63,000.00 for actual pain and suffering, plus $1,308.09 for past expenses.**

I. **Relevant Procedural History**

Along with his petition, Mr. Morgan filed the medical records and affidavit required under the Vaccine Act. Exhibits 1-8; *see* Section 11(c). On November 17, 2020, the case was activated and assigned to the SPU (OSM's adjudicatory system for attempting to resolve cases deemed likely to settle). ECF No. 8.

On December 29, 2021, Respondent filed his Rule 4(c) Report conceding Petitioner was entitled to compensation, and I issued a Ruling on Entitlement the same day. ECF Nos. 16-17. For approximately two months thereafter, the parties attempted to informally resolve the issue of damages. *See, e.g.*, Status Report, filed Jan. 31, 2022, ECF No. 19. On March 3, 2022, they informed me they had reached an impasse in their damages discussions. ECF No. 21.

In early May 2022, the parties filed their damages briefs, and Petitioner filed documentation regarding his claimed expenses. Respondent's Brief on Damages ("Opp."), May 2, 2022, ECF No. 22; Petitioner's Brief in Support of Damages Decision ("Brief"), May 3, 2022, ECF No. 23; Exhibits 10-11, ECF No. 24. Neither party filed a responsive brief by the deadline set thereafter. *See* Order, issued May 4, 2022.

In response to an inquiry by the OSM staff attorney assisting me on this SPU case, the parties confirmed the disputed expenses consisted of a $150.00 payment to the physical therapy ("PT") clinic Petitioner first attended in in early August 2020 – although the quality of this receipt was poor and it did not indicate the item purchased (Exhibit 10 at 7), and claimed mileage (Exhibit 11). *See* Informal Remark, dated Aug. 3, 2022. On August 3, 2022, Petitioner filed a better copy of the receipt for $150.00 paid to Petitioner's PT clinic, but did not provide further explanation regarding this charge. Exhibit 12, ECF No. 27. The matter is now ripe for adjudication.

II. **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury,

and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at \*22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at \*9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at \*3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at \*9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at \*3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[3] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, Judge Merow

---

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

### III.    Prior SIRVA Compensation Within SPU[4]

#### A.    Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2022, 2,723 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 2,651 of these cases, with the remaining 72 cases dismissed.

Of the compensated cases, 1,513 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 114 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[5]

1,371 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

---

[4] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[5] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

The remaining 1,138 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[6] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *114* | *1,371* | *28* | *1,138* |
| **Lowest** | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $72,354.81 | $67,472.00 | $90,000.00 | $40,000.00 |
| **Median** | **$102,479.12** | **$86,927.85** | **$122,886.42** | **$60,000.00** |
| **3rd Quartile** | $125,343.45 | $115,000.00 | $161,001.79 | $115,000.00 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.   Pain and Suffering Awards in Reasoned Decisions

In the 114 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $100,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[7]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many

---

[6] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[7] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

5

petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). Only one required surgery. Except in one case with an award for pain and suffering slightly below the median amount, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions, a PT duration of more than three years, and multiple cortisone injections, were required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### IV.   The Parties' Arguments

Petitioner seeks compensation in the amount of $75,763.40, representing $74,000.00 for his pain and suffering, $1,458.09 for his put-of-pocket expenses, and $305.31 for mileage. Brief at 1, Exhibits 10-11. To support the amount sought for pain and suffering, he emphasized the immediate nature and severity of his pain, significant limitations in range of motion ("ROM"), young age at the time of injury – 21 years old, and lack of any prior left shoulder issues. Brief at 6. He noted that "[f]our and a half months post-vaccination, on November 23, 2019, he was still 'very restricted in his range of motion of his left shoulder due to pain . . . visibly uncomfortable with attempts to progress his flexion and abduction ranges of motion.'" Brief at 10 (quoting Exhibit 5 at 42.)

Regarding the overall duration of his SIRVA injury, Petitioner stressed that he pursued formal treatment for more than six months, through mid-February 2020. Brief at 7. Emphasizing his continued fatigue and limitations in ROM and the recommendation for additional PT at his last session on February 14th (*see* Exhibit 5 at 9), Petitioner maintained that the lack of additional treatment thereafter was due solely to the COVID pandemic. Brief at 7-8. He insisted that he continues to experience low-grade, throbbing pain at a level of three to four out of ten, and that his grades suffered during his injury. *Id.* at 8.

6

Petitioner compared the facts and circumstances in his case favorably with the experiences of the petitioners in *Sherbine* and *Garrett,* who received $75,000.00 and $70,000.00, respectively, for their past pain and suffering.[8] Brief at 8-9. Although he equated his pain with that suffered by the *Sherbine* petitioner, Petitioner contrasted the time between injury and first treatment – noting the *Sherbine* petitioner delayed seeking treatment for six months. *Id.* at 9. He argued that his pain levels and restriction in ROM were greater than that suffered by the *Garrett* petitioner. *Id.*

Regarding the expenses he seeks, Petitioner submitted receipts and other documentation showing that he paid co-pays totaling $1,308.09. Exhibit 10. For the additional payment of $150.00, he submitted only an unsigned credit card receipt dated August 8, 2019. Exhibit 10 at 7; Exhibit 12. He provided no accompanying documentation or explanation as to the purpose of this purchase. To substantiate the claimed mileage amount of $305.31, Petitioner submitted a list of mileage to and from medical appointments in Overland Park and Lawrence, Kansas. Exhibit 11.

Respondent proposes that Petitioner should receive $45,000.00 for his actual pain and suffering, and $1,308.09 for his past unreimbursed expenses. Opp at 1. Although he later confirmed by email correspondence that he opposes payment of the $150.00 purchase and claimed mileage, he provided no rationale for his position.

To support this lower pain and suffering amount, Respondent insisted that, by Petitioner's last PT session in February 2020, Mr. Morgan "had returned to full activity and was able to exercise, including bench press, without issues." Opp. at 2. He emphasized the results of Petitioner's second MRI, performed on December 24, 2019, which "showed full resolution of [P]etitioner's shoulder inflammation and confirmed the absence of any pathological structural damage." *Id.* at 3.

Respondent compared the facts and circumstances in Petitioner's case favorably to those experienced by the *Ramos* petitioner, who was awarded $40,000.00 for his actual pain and suffering.[9] Opp. at 2. Acknowledging that the *Ramos* petitioner delayed seeking treatment for almost four months post-vaccination, Respondent argued this difference is negated by the longer duration of the *Ramos* petitioner's injury – thirteen months in all with some initial relief after his first round of PT. *Id.* at 2-3.

[8] *Sherbine v. Sec'y of Health & Hum. Servs.,* No.17-0413V, 2020 WL 1933136 (Fed. Cl. Spec. Mstr. Mar. 27, 2020); *Garrett v. Sec'y of Health & Hum. Servs.,* No.18-0490V, 2019 WL 2462953 (Fed. Cl. Spec. Mstr. Apr. 8, 2019).

[9] *Ramos v. Sec'y of Health & Hum. Servs.,* No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021).

**V.     Appropriate Compensation**

    **A.     Facts and Circumstances**

        *1. From Medical Records*

When seeking treatment on July 11, 2019, just five days post-vaccination, Petitioner described a dull ache which increased to a level of eight to nine out of ten with movement. Exhibit 2 at 122. Upon examination, he showed diminished range of motion and an inability to "raise the shoulder or elbow above 90 degrees due to discomfort in the deltoid area." *Id.* at 124. Petitioner repeated these symptoms when seen by an orthopedist on July 22nd, and an MRI performed a few days later revealed inflammation. Exhibit 3 at 13-14.

At his first PT session on August 9th, Petitioner reported current pain of two out of ten which could rise to a level of ten out of ten at its worst. Exhibit 4 at 23. Petitioner attended a total of four PT sessions at a clinic near his home, during August 2019. Exhibit 4 at 9-31.

It appears Petitioner then returned to college as he began attending PT at a clinic approximately 80 miles away in Lawrence, Kansas - close to the university he likely attended. At his first visit on September 19th, he reported pain levels which generally ranged from two to five during specific activities. Exhibit 5 at 73. Reporting that his worst pain level was seven out of ten, Petitioner indicated he had no pain when removing something from his pocket and pain at a level of ten when placing or attempting to remove an object from a top shelf – a task he was unable to accomplish. *Id.* By his third PT session at this clinic on October 26th,[10] Petitioner reported that his home exercise program was helping. *Id.* at 53. By his fourth visit on October 31st, he indicated he "has been able to work out including biceps curls, tricep[s] extension, machne [sic] chest press without pain reproduction." *Id.* at 49. However, he continued to exhibit limitations in his ROM. *Id.* at 23-36.

In November 2019, Petitioner attended PT at both clinics: his fifth visit to the clinic near his home on November 11th, and his sixth visit to the Lawrence clinic near his school on November 22nd. Exhibit 4 at 2-8; Exhibit 5 at 41-45. At the November 22nd visit, he indicated that he tried benching pressing a lighter weight than he used prior to his shoulder injury and that "his shoulder has been very sore over the past few days since

---

[10] Although twelve visits had been authorized in September 2019 (*see* Exhibit 5 at 59), it was noted that scheduling difficulties had resulted in Petitioner having attended only three sessions by late October. *See id.* at 53.

8

the last workout." Exhibit 5 at 41.

On November 27th – most likely during his Thanksgiving break, Petitioner returned to his orthopedist, reporting concern at his slow progress. Exhibit 3 at 8. The orthopedist noted improvement since Petitioner's last examination, but ordered another MRI due to Petitioner's concerns. *Id.* The results of the MRI – performed in late December, were normal. *Id.* at 6.

At his December 13th PT session, Petitioner reported a slight setback, indicating he was "very sore for 2-3 days after the last sessions but continues to feel that [t]he PT is helping despite the increase in pain." Exhibit 5 at 26. However, by his seventh PT session at the Lawrence clinic on January 10, 2020, Petitioner reported the ability "to do more of his workouts without much pain" and a belief that "he is more limited by tightness in his shoulder than pain at this point." *Id.* at 37. He attributed at least some of his greater left-sided weakness to his right-handed dominance. *Id.* at 38. By his eighth session at the Lawrence clinic on December 30th, Petitioner indicated that his ROM and strength had improved and he "[h]as able to be more active." *Id.* at 23.

Pursuant to a new PT order for twelve additional sessions, Petitioner returned to PT on February 7, 2020. Exhibit 5 at 12, 16 (new PT order dated the previous day).  At that initial visit, it was noted that Petitioner was making good progress with ROM and strength and [h]as been able to return to full activity without much pain, [but] weight lifting return has been more gradual." *Id.* At his second and last visit on February 14th, Petitioner reported being "able to bench press without any issues," although he indicated being "a little sore after the last visit." *Id.* at 9.

### 2.  From Petitioner's Affidavit

In his supplemental affidavit, Petitioner indicated that "[d]uring the first few months following the injection, [his] shoulder was nearly completely frozen and [he] was in constant pain all day (9-10 level constantly)." Exhibit 9 at ¶ 5. He maintained that he "missed out on over a year of [his] youth and was unable to do any physical activities that [he] used to participate in such as working out, riding [his] motorcycle, and even making [his] bed" (*id.* at ¶ 6), and that his grades declined (*id.* at ¶ 7). Describing pain which radiated from his shoulder to his fingertips and caused "misery each and every day," Petitioner asserted that his injury exacerbated his already existing anxiety, causing constant stress and panic attacks. *Id.* at ¶ 6. He contrasted his prior weight-lifting abilities with what he could do post-vaccination and insisted he was unable to receive the care he needed due to his busy student schedule. *Id.* at ¶¶ 6-7.

Maintaining that the COVID pandemic was the reason he did not pursue further

PT (Exhibit 9 at ¶ 7), Petitioner alleged that his injury continues to affect "many aspects of [his] day to day life" and "caused [him] to change the way [he] live[s]." *Id.* at ¶ 8. He described continued low-grade and throbbing pain throughout the day and increased pain of a level of seven to eight with too quick or incorrect movement. *Id.* at ¶ 9. Describing a constant pressure and sometime small clicking noise, Petitioner reported his symptoms "can still interfere with [his] sleep." *Id.*

### B.     Appropriate Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A thorough review of the medical records reveals that Mr. Morgan suffered a SIRVA injury involving immediate and severe pain with movement and thus, significant limitations in his ROM. Initially, his pain ranged from two to ten – a dull ache which became sharp with movement. An MRI performed two weeks post-vaccination revealed inflammation and edema. At his first visit through his PT session in late September 2019, Petitioner exhibited significant limitations in his ROM.

However, even Petitioner's initial pain at rest was lower – two out of ten when he first reported his injury. And at his late September PT visit, his reported pain level was three to five with most movement. Only when he attempted to reach overhead did his pain reach severe levels – eight to nine and ten.

Furthermore, Petitioner showed significant improved during PT sessions in October and November 2019. By late October, he was working out with weights. And the results of an MRI performed in December were normal. After only a few more PT sessions, it was noted that Petitioner could perform full activity without much pain. By his last PT session in mid-February 2020, he was bench pressing weights without issue.

In his supplemental affidavit, Petitioner described constant severe pain and a nearly frozen shoulder, failed to mention the improvements he experienced from PT sessions he attended, and attributed the cessation of his treatment solely to the COVID

pandemic. His account is not supported by the information contained in the medical records. *See Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993) (contemporaneously created medical records are generally viewed as more reliable that any current assertions, especially when they are supported by other medical record entries).

Despite his assertion of more extreme symptoms and duration, Petitioner did provide helpful comparable cases. Like the Petitioner in this case, the *Sherbine* petitioner suffered immediate pain, especially when reaching overhead which resulted in significant limitations in ROM. *Sherbine,* 2020 WL 1933136, at *10. However, she did not experience the more immediate relief Petitioner experienced in response to PT, approximately four months post-vaccination. Eight months post-vaccination, the *Sherbine* petitioner continued to suffer severe levels of pain – ranging from five to ten. *Id.* Thus, Petitioner's pain and suffering compensation should be lower than the $75,000.00 awarded to the *Sherbine* petitioner.

Although the *Garrett* case provides a more comparable comparison, the award in this case still should be lower. The $70,000.00 awarded in *Garrett* was based in part on the fact that the *Garrett* petitioner was benched during his junior year of high school basketball, after earning, for the first time, a position on the varsity team. *Garrett,* 2019 WL 2462953, at *10. Despite Petitioner's similar young age and college attendance, he did not experience the disappointment associated with such a significant missed opportunity. Although Petitioner argued that his injury affected his grades, he provided no evidence to support this assertion. Still, given the similar ages, pain levels, and duration of these injuries, Petitioner's pain and suffering compensation should be closer to, although still lower, than that awarded to the *Garrett* petitioner.

In contrast, the case cited by Respondent does not provide a helpful comparison. There are significant differences between the facts and circumstances experienced by the *Ramos* petitioner and the Petitioner in this case which render any comparison ineffective. For example, the *Ramos* petitioner delayed seeking treatment of his SIRVA injury for approximately four months, despite attending intervening medical appointments for unrelated conditions. *Ramos,* 2021 WL 688576, at *5. Additionally, the *Ramos* petitioner's initial pain level was not as significant and decreased substantially approximately one month after he sought treatment. *Id.* at *2-3.

Rather, I find there are substantial similarities between the facts and circumstances in this case and those suffered by the petitioner in *Dagen,* who received $65,000.00 for her pain and suffering.[11] Like Mr. Morgan, the *Dagen* petitioner quickly sought treatment

---

[11] *Dagen v. Sec'y of Health & Hum. Servs.,* No. 18-0442V, 2019 WL 7187335 (Fed. Cl. Spec. Mstr. Nov. 6, 2019).

for her injury, experienced significant levels of pain and limitations in ROM, and obtained relief by seven months post-vaccination following 16 PT sessions. *Dagen,* 2019 WL 7187335, at *2-4, 9-10. Although the *Dagen* petitioner's improvement was slightly slower – 80 percent by five months post-vaccination, she also was older at the time of vaccination and exhibited some evidence of degenerative changes. *Id.* Thus, I find that a pain and suffering award of $63,000.00 is appropriate in this case.

### C.     Unreimbursable Expenses

Because the parties have agreed that Petitioner should be compensated for the $1,308.09 in co-pays paid by Petitioner, the only areas of dispute involve the $150.00 purchase on August 9, 2019, and mileage costs Petitioner has claimed. I will not compensate Petitioner for either of these amounts due to a lack of adequate supporting documentation.

Petitioner failed to indicate the purpose of the $150.00 payment to the PT clinic, which is supported only by an unsigned credit card receipt. Similarly, Petitioner provided a list of mileage driven on dates when he received medical treatment, but failed to confirm or to provide additional evidence to show, that he drove these distances in his own vehicle solely for the purpose of obtaining medical treatment.

Mileage costs have been paid in other Program cases. *See,* e.g., *Tyler v. Sec'y of Health & Hum. Servs.*, No. 18-0355V, 2019 WL 6118229 (Fed. Cl. Spec. Mstr. Sept. 5, 2019) (proffered award which included payment for mileage costs). However, the costs must be shown to be related to the vaccine-related injury. *See S.C. v. Sec'y of Health & Hum. Servs.*, No. 19-0341V, 2021 WL 2949763, at *5 (Fed. Cl. Spec. Mstr. June 14, 2021) (compensation allowed for only mileage related to the SIRVA injury). And the purpose of this reimbursement is to compensation a petitioner for the additional miles driven in his or her vehicle. Thus, no mileage compensation has been awarded when a petitioner was unable to drive herself to her medical appointments and was required to rely upon rides from family and friends[12] or when a petitioner was using a friend or family member's car.[13]

In this case, there is evidence that Petitioner was accompanied to all orthopedic appointments by at least one parent. *See* Exhibit 3 at 8, 10, 16. Additionally, it appears that, for at least some visits, Petitioner drove 82 miles – the approximate distance from

---

[12] *Frye v. Sec'y of Health & Hum. Servs.*, No. 18-1091V, 2020 WL 8457671, at *6 (Fed. Cl. Spec. Mstr. Dec. 16, 2020) (disallowed mileage after petitioner was unable to drive).

[13] *Ashe-Robinson v. Sec'y of Health & Hum. Servs.*, No. 94-1096V, 1997 WL 53450, at *2 (Fed. Cl. Spec. Mstr. Jan. 23, 1997) (no mileage awarded for trips made using a friend or family member's car).

his home to the Lawrence clinic near his university. It is not clear whether Petitioner or one of his parents were driving this distance. If the former, it appears the purpose of the trip was not only to seek medical treatment, but perhaps to return to school. If the later, Petitioner may not have been in the car. Given his young age at the time of his injury, it is not clear that Petitioner even own a vehicle. Without further explanation regarding the mileage claim, I cannot determine that it is appropriate compensation.

### VI.   Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $63,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[14] I also find that Petitioner is entitled to $1,308.09 in actual unreimbursable expenses.**

Based on the record as a whole and arguments of the parties, **I award a lump sum payment of $64,308.09 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[15]

**IT IS SO ORDERED.**

<div style="text-align: right;">

s/Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

</div>

---

[14] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[15] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.